# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ONE SOURCE HEATING & COOLING, LLC
PO Box 739
Gardendale, Alabama 35071,

                    Plaintiff,

         v.

GRAY TELEVISION, INC.
4370 Peachtree Road, NE, Suite 400
Atlanta, Georgia 30319;

HEARST COMMUNICATIONS INC.
300 West 57th Street
New York, New York 10019;

NEXSTAR MEDIA GROUP, INC.
545 East John Carpenter Freeway, Suite 700
Irving, Texas 75062;

SINCLAIR BROADCAST GROUP, INC.
10706 Beaver Dam Road
Hunt Valley, Maryland 21030;

TEGNA, INC.
7950 Jones Branch Drive
McLean, Virginia, 22107;

TRIBUNE MEDIA COMPANY
515 North State Street
Chicago, Illinois 60654; and

TRIBUNE BROADCASTING COMPANY, LLC
435 N. Michigan Avenue
Chicago, Illinois 60611;

                  Defendants.

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff One Source Heating & Cooling, LLC ("Plaintiff") brings this action on behalf of itself and on behalf of a class of all similarly situated persons and entities in the United States, its territories, and the District of Columbia (the "Class") for damages and injunctive relief under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) against Defendants Gray Television, Inc. ("Gray TV"), Hearst Communications Inc. ("Hearst"), Nexstar Media Group, Inc. ("Nexstar"), Sinclair Broadcast Group, Inc. ("Sinclair"), Tegna, Inc. ("Tegna"), and Tribune Media Company and Tribune Broadcasting Company, LLC (together, "Tribune") (collectively, "Defendants"). Based on information and belief, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.       This antitrust class action arises from a conspiracy among Defendants and their coconspirators to fix prices for commercials to be aired on broadcast television stations throughout the United States in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, by sharing competitively sensitive information through their advertising sales teams. Defendants' and their co-conspirators' unlawful collusion led to supracompetitive prices in the market for the sale of television advertising.

2.       Specifically, Defendants and their co-conspirators shared proprietary information with each other and conspired to fix prices and stifle competition in the market, rather than competing on price for advertising sales as horizontal competitors typically would.

3.       Defendants have significant market penetration for advertising in the United States. Together, commercials on Defendants' stations reach over 80 percent of all U.S. homes.

4.       The sale of commercials on television stations is a primary source of revenue for broadcasting companies, including Defendants.

5.      Defendants and other broadcast television companies have experienced significant slowing in revenue growth in recent years, in part due to increased competition from online advertising.

6.      In response to this reduction in revenue growth, Defendants have sought to achieve economies of scale and expand their customer bases via mergers with and acquisitions of other broadcast television companies.

7.      For example, Sinclair announced its intention to acquire Tribune over a year ago, but announced on August 9, 2018, that it terminated its $3.9 billion merger agreement with Sinclair and is now suing Sinclair for $1 billion for breach of contract. In July 2018, the Federal Communications Commission ("FCC") unanimously decided not to approve the merger due to concerns on the part of the FCC regarding Sinclair's ability to comply with the National TV Ownership rule.

8.      However, the FCC's National TV Ownership Rule prohibits Defendants and other broadcast television companies from individually owning a group of broadcast television stations that enables them to reach more than 39 percent of all U.S. television households. As a result, Defendants and other broadcast television companies have been unable to sufficiently increase advertising revenues solely through mergers and acquisitions.

9.      Because of the FCC's restraints on mergers and acquisitions, Defendants and their co-conspirators have attempted to raise advertising revenue by colluding on pricing for television advertising, thereby artificially inflating pricing above competitive levels.

10.     Defendants and their co-conspirators had numerous opportunities to conspire through trade associations such as the Television Bureau of Advertising, Inc. and the National

Association of Broadcasters, in conferences and meetings held by those organizations, and during merger negotiations.

11.     Defendants' scheme aimed to charge supracompetitive prices for television advertising. Because the companies together reach over 80 percent of U.S. households, Defendants were able to conspire to fix, raise, maintain, stabilize, or artificially inflate prices for television advertising without repercussions.

12.     Defendants colluded by sharing competitively sensitive information and data with each other through their advertising sales teams. Defendants used this data to raise advertising prices to supracompetitive levels.

13.     On July 26, 2018, *The Wall Street Journal* reported that the United States Department of Justice ("DOJ") was investigating Sinclair, Tribune, and other unnamed independent TV station owners—possibly including Hearst, Nexstar, and Tegna—for inflating prices of television ads by coordinating efforts when their ad sales teams communicated with each other about their performance.[1]

14.     Plaintiff and members of the Class are direct purchasers of television advertising from one or more Defendants or their co-conspirators within the United States. Specifically, Plaintiff purchased television advertising from Sinclair.

15.     From at least January 1, 2014 through the present (the "Class Period"), Defendants' conduct proximately and foreseeably caused Plaintiff and members of the Class

---

[1] Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, WALL ST. J. (July 26, 2018, 5:38 PM ET), https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979 (appeared in the July 27, 2018 print edition as "TV Station Owners Face Ad-Pricing Probe").

injury by stifling competition and inflating, fixing, raising, stabilizing, or maintaining supracompetitive prices for television advertising in the United States.

16.     The impact of Defendants' unlawful and anticompetitive conduct is ongoing and continues to this day and requires injunctive relief to prevent future harm to Plaintiff and members of the Class.

17.     Until the publication of reports regarding the DOJ investigation on July 26, 2018, Defendants fraudulently concealed their unlawful conduct from Plaintiff and members of the Class. Plaintiff and members of the Class had no way of knowing the advertising rates they were paying were the result of unlawful collusion.

18.     Plaintiff and members of the Class seek injunctive relief and damages for their injuries caused by Defendants' collusive, manipulative, and anticompetitive restraint of competition in the market for television advertising in the United States. Specifically, Plaintiff seeks injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees on behalf of itself and the Class of direct purchasers, as defined herein, under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

**JURISDICTION AND VENUE**

19.     Jurisdiction exists under Section 16 of the Clayton Act, 15 U.S.C. § 26, to award equitable and injunctive relief for violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. The Court has original federal jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) to award damages for violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

20.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b)–(d) because Defendants regularly transact business in this District. In addition, a substantial part of the events giving rise to Plaintiff's claims occurred within this District and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

21.     This Court has personal jurisdiction over all Defendants because each Defendant is believed to have transacted business throughout the United States, including in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States, including in this District.

22.     In addition, Defendants' conspiracy was directed at, and had the intended effect of causing injury to persons residing in, located in, or doing business in the United States, including in this District, and Plaintiff's claims arise out of Defendants' conduct.

23.     Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

## THE PARTIES

### I.     Plaintiff

24.     Plaintiff One Source Heating & Cooling, LLC is a heating, cooling, and HVAC services provider located in Birmingham and Dothan, Alabama, and is a direct purchaser of television advertising from Sinclair. Plaintiff has purchased television advertising from Sinclair throughout the Class Period. As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Plaintiff has paid artificially inflated prices for television advertising and has been injured in its business or property.

### II.    Defendants

25.     Defendant Sinclair Broadcast Group, Inc. is a Maryland corporation headquartered in Hunt Valley, Maryland. Sinclair is a diversified television broadcasting company. Sinclair is the largest owner of broadcast television stations in the United States, with 193 stations in approximately 90 cities.

26.     Defendant Tribune Media Company is a Delaware corporation headquartered in Chicago, Illinois. Tribune Media Company is a diversified media and entertainment business. Tribune owns 43 broadcast television stations in approximately 35 cities.

27.     Defendant Tribune Broadcasting Company, LLC is a Delaware limited liability company headquartered in Chicago, Illinois. Tribune Broadcasting Company, LLC is a television broadcasting company that operates as a subsidiary of Tribune Media Company.

28.     Defendant Gray Television, Inc. is a Georgia corporation headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia, 30319. Gray TV is a television broadcast company that owns and operates television stations and digital assets in the United States. As of February 23, 2018, Gray TV owned and operated television stations in 57 television markets, broadcasting approximately 200 program streams, including approximately 100 channels affiliated with the CBS Network, the NBC Network, the ABC Network, and the FOX Network.

29.     Defendant Hearst Communications Inc. is a Delaware corporation headquartered at 300 West 57th Street, New York, New York 10019. Hearst is a diversified media and information company that operates television stations and cable networks throughout the United States.

30.     Defendant Nexstar Media Group, Inc. is a Delaware corporation headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062. Nexstar operates as a television broadcasting and digital media company in the United States. As of December 31,

2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 markets.

31.     Defendant Tegna Inc. ("Tegna") is a Delaware corporation headquartered at 7950 Jones Branch Drive, McLean, Virginia, 22107. Tegna is a broadcasting, digital media, and marketing services company that owns and operates 47 television stations in 39 markets across the United States.

## III.    Co-Conspirators and Agents

32.     Various persons and/or firms not named as defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

33.     Each Defendant and their respective subsidiaries acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

34.     The market for television advertising was particularly susceptible to collusion during the Class Period because: (1) there are a limited number of television station owners selling television advertising; (2) the barriers to entry are extremely high; (3) Defendants and their co-conspirators had a motive to collude on television advertising prices; and (4) Defendants had ample opportunities to conspire with each other through industry associations and initiatives.

## I.    Background on Ownership of Local Television Channels

35.     Local TV stations carry programming that is distributed through their parent companies' broadcast antennae. Some programming is provided by third-party network and syndicators (such as ABC and NBC). Some content, including local news, comes from the parent

company itself. The parent company's affiliate stations employ teams of reporters and producers and anchors who typically produce three local newscasts a day—in the morning, the late afternoon, and late at night. The parent company can order stations to pursue certain stories or to air certain clips. Networks like ABC and NBC are not involved in these decisions.

36.     Local news programs are some of the most-watched shows in America. About 23 million Americans tune into the evening local news, and 12 million watch the early morning local news. In contrast, the three top cable networks—CNN, Fox News, and MSNBC—draw around 3 million primetime viewers daily.[2]

37.     In 2016, the five largest companies in local TV were Defendants Sinclair, Nexstar, Gray, Tegna, and Tribune. These five companies owned, operated, or serviced 443 full-powered stations, or an estimated 37 percent of all full-power local TV stations in the country, as identified in a Pew Research Center analysis of BIA Kelsey data. This represents a 147.5 percent increase from the number or local TV stations they owned, operated, and serviced in 2004. As discussed in more detail below, a wave of consolidation and station purchases have made some broadcast media owners considerably larger.

## II.     FCC Deregulation

38.     The expansion of these major firms is a direct result of the deregulation by the FCC. As detailed below, the FCC sets limits on the number of broadcast stations an entity can own, as well as limits on the common ownership of broadcast stations and newspapers. The goal of these limits is to preserve competition and prevent the formation of monopolies. The FCC reviews its media ownership rules every four years—during its "quadrennial review"—to

---

[2] Jeff Guo, *The Imminent Conservative Takeover of Local TV News, Explained*, Vox (May 15, 2017, 1:20 PM EDT), https://www.vox.com/2017/5/15/15598270/sinclair-broadcast-imminent-conservative-takeover-of-local-tv-news-explained.

determine whether the rules are in the public interest and to repeal or modify any regulation it determines does not meet these criteria.

39.     The regulation described below has consolidated the channels for Defendants' illegal communications, and has made it easier to facilitate collusion among participants with substantial market share.

40.     The FCC regulations relevant to local TV date back to the 1940s, when the FCC decreed that companies could only own three TV stations at once. By the 1950s, there was the so-called "Rule of Seven," which restricted owners to seven FM, seven AM, and seven TV stations. One of the most significant rules currently is the *National TV Ownership Rule*, under which a company's portfolio of TV stations cannot reach more than 39 percent of all U.S. television households. Unlike many of the specific limits set forth in the commission's rules, the 39 percent cap was explicitly established by Congress in 2004 and was removed from the FCC's review in the quadrennial ownership reviews.

41.     In the past few decades, the FCC has continued to loosen its regulations, most recently via a November 2017 Ownership Order on Reconsideration (the "Ownership Order") that went into effect on February 7, 2018.[3]

42.     *Newspaper/Broadcast Cross-Ownership Rule*: Before the Ownership Order, this rule prohibited common ownership of a full-power broadcast station (AM, FM, or TV) and a daily newspaper if the station's contour (defined separately by type of station) completely

---

[3] *In re: 2014 Quadrennial Regulatory Review*, Order on Reconsideration and Notice of Proposed Rulemaking (Nov. 20, 2017), U.S. Fed. Commc'n Comm., *available at* https://docs.fcc.gov/public/attachments/FCC-17-156A1.pdf (changes to go into effect 30 days after publication in Federal Register); 2014 Quadrennial Regulatory Review, 83 Fed. Reg. 733 (Jan. 8, 2018) (codified at 37 C.F.R. pt. 73), *available at* https://www.federalregister.gov/documents/2018/01/08/2017-28329/2014-quadrennial-regulatory-review (Jan. 8, 2018 publication in Federal Register).

encompasses the newspaper's city of publication and the station and newspapers are in the same relevant Nielsen market, when defined.[4] The Ownership Order eliminated this rule.

43. *Radio-Television Cross-Ownership Rule*: The previous rule, known as a duopoly rule, prohibited an entity from owning more than two television stations and one radio station in the same market, unless the market met certain size criteria. Specifically, if at least ten independently owned media voices would remain in the market post-merger, an entity was permitted to own up to two television stations and four radio stations. And if at least 20 independently owned media voices would remain in the market post-merger, an entity was permitted to own either: (1) two television stations and six radio stations, or (2) one television station and seven radio stations. The Ownership Order eliminated this rule.

44. *Local Television Ownership Rule*: According to the former duopoly rule, an entity could own up to two television stations in the same market if (1) the digital noise limited service contours (NLSCs) of the stations do not overlap or (2) at least one of the stations is not ranked among the top-four stations in the market (the "Top-Four Prohibition") and at least eight independently owned television stations would remain in the market following the combination (the "Eight Voices Test"). The Ownership Order eliminated the Eight Voices Test and modified the Top-Four Prohibition to a case-by-case application, thereby making a huge change to the FCC's primary duopoly rule affecting local TV.

45. In addition to the Ownership Order, an April 2018 FCC decision reopening a loophole called the "UHF discount" enhanced the ability of parent companies to consolidate and grow even larger.

---

[4] *FCC Fact Sheet: Review of the Commission's Broadcast Ownership Rules, Joint Sales Agreements, and Shared Services Agreements, and Comment Sought on an Incubator Program*, *available at* https://docs.fcc.gov/public/attachments/DOC-347796A2.pdf.

46.     Television stations use one of two different kinds of wavelengths, VHF or UHF. Until 2009, stations licensed to broadcast on VHF were more valuable, because VHF waves are larger, travel farther, and can reach homes more easily. Because UHF stations were less desirable than VHF stations, in calculating ownership limits, the FCC gave companies a "UHF discount"— only half of a UHF station's audience would count toward a company's limit of 39 percent of American households.

47.     But in 2009, American television stations switched to digital broadcasting. When that happened, UHF stations were no longer at a disadvantage; in fact, they were more desirable. Although UHF frequencies don't penetrate as far as VHF, they are less prone to the kind of interference that affects digital TV signals, so customers get a clearer picture.

48.     Long before the digital transition was complete, the FCC had warned that it would eventually do away with the UHF discount. Expecting this, many broadcasting companies have been wary of moving forward with mergers because without the discount, many of them were already dangerously close to the 39 percent ownership cap.

49.     In 2016, after a long period of debate, the FCC finally eliminated the UHF discount. FCC chair Ajit Pai, however, reversed that decision and reinstated the UHF discount in late April 2018 to allow parent companies to grow. Although Pai agrees that the UHF discount doesn't make sense anymore in the age of digital broadcasting, he has hinted that he views the UHF discount as a temporary measure until the ownership cap can be increased.

III.    **The Number of Companies Selling TV Commercials Is Already Limited and Is Only Decreasing**

50.     In response to their customers' decreased advertising spending, Defendants have attempted to grow their customer bases through mergers and acquisitions to achieve economies of scale to remain profitable, thereby increasing market concentration.

51.     Defendants Sinclair and Tribune began discussing a potential merger years ago and publicly announced their plans in May 2017. The merger plan that Sinclair and Tribune submitted to antitrust regulators stated that Sinclair would acquire Tribune for $3.9 billion, forming a company that would own 215 broadcast television stations in 102 cities, reaching close to 60 percent of all U.S. television households.

52.     In July 2018, the FCC unanimously decided not to approve the merger due to concerns on the part of the FCC regarding Sinclair's ability to comply with the National TV Ownership rule. The FCC had been concerned that Sinclair did not intend to actually relinquish control over television stations that it proposed to divest in order to comply with the National TV Ownership rule. The FCC had suspected that certain "sidecar" agreements that would allow Sinclair to retain control of stations.[5]

53.     On August 9, 2018, Tribune announced that it had terminated its $3.9 billion merger agreement with Sinclair. Tribune is now suing Sinclair for $1 billion for breach of contract.

54.     Even without an approved merger, Sinclair and Tribune's conspiracy has allowed them to jointly control advertisers' ability to reach more than 80 percent of U.S. households and to use this control to stifle competition. From at least 2016 forward, Sinclair and Tribune used their combined reach to conspire to charge supracompetitive prices for television advertising in violation of federal antitrust laws. In addition, Sinclair's attempt to acquire Tribune provided an

---

[5] Edmund Lee, *Sinclair Tries to Appease F.C.C., but Its Tribune Bid Is Challenged*, N.Y. TIMES (July 18, 2018), https://www.nytimes.com/2018/07/18/business/media/sinclair-tribune-fcc.html (appeared in print on July 18, 2018, on Page B3 of the New York edition with the headline "Sinclair Alters Tribune Bid, but F.C.C. Orders Review").

additional opportunity for the companies to collude to artificially inflate prices for television advertising.

55.     Sinclair is not the only television broadcasting company to seek economies of scale by expanding customer bases through acquiring additional television stations. On June 25, 2018 Gray TV agreed to buy fellow television station owner Raycom Media Inc. in a $3.65 billion deal that would create a single company reaching nearly a quarter of U.S. TV households. If the Gray-Raycom deal is completed, the combined company would own 142 television stations in 92 U.S. markets, reaching 24 percent of TV households and owning the third-largest number of stations.



**Scaling Up**
By buying Raycom, Gray Television will reach 24% of all U.S. television households.

˟When deal closes
Source: Gray Television

## IV.   Defendants and Their Co-Conspirators Have a Common Motive to Conspire—a Desire to Maintain and Increase Their Profits in the Face of Decreasing Advertising Revenue

56.     The sale of commercials on television stations to advertising customers is a primary source of revenue for broadcasting companies, including Defendants.

57.     In a competitive market, local TV stations compete for audience share and advertising revenue in their respective Designated Market Areas ("DMAs"), or regions where the population can receive the same or similar television station offerings. Not every station is on equal footing; competitors that are part of larger organizations have substantially greater financial, technical, and other resources. According to Sinclair's 10-K SEC filing filed at the beginning of 2018, other factors affecting a television station's competitive position are signal coverage, local program acceptance, network affiliation or program service, audience characteristic, and assigned broadcast frequency.

58.     In recent years, television broadcasting companies have experienced significant slowing of growth in their advertising revenues.

59.     This mirrors the overall drop in television viewing by U.S. audiences, which has fallen dozens of hours a month for all groups under the age of fifty since 2010.[6]

---

[6] Derek Thompson, *TV's Ad Apocalypse Is Getting Closer*, THE ATLANTIC (Aug. 10, 2017), https://www.theatlantic.com/business/archive/2017/08/tvs-ad-apocalypse-is-coming/536394/.



60.     The following chart depicts the slowing growth of television advertising spending in the United States since 2012 due to increased competition from internet and other advertising platforms.



**Drop in National TV Ads Forecast**

The ad-buying firm Magna said that national TV ad sales fell 2.2 percent in 2017. It predicted that they would decline at least 2 percent each year through 2022.

The forecast excludes local TV and ads from cyclical events like the Olympics and U.S. presidential campaigns.

By The New York Times | Source: Magna

61.     As shown above, TV advertising spending stalled in 2016 and began to decline thereafter. U.S. television advertising sales fell 7.8 percent to $61.8 billion last year, the steepest drop outside of a recession in at least 20 years, while sales at cable networks dropped for the first time in almost a decade.[7]

62.     The chart also predicts that TV advertising spending will continue to decrease over the next few years.

63.     Despite decreased television advertising spending, Defendants have grown or substantially maintained revenue levels since 2016, as shown below:

---

[7] Lucas Shaw, *Advertisers Tuning Out TV in Sign of Trouble for Media Companies,* BLOOMBERG (Feb. 14, 2018, 4:00 AM PST), https://www.bloomberg.com/news/articles/2018-02-14/advertisers-tuning-out-tv-in-sign-of-trouble-for-media-companies.



## Five-Year Local Television Station Revenue Forecast

*Forecast Combines Retransmission, Over-the-Air, Digital Revenue*

Source: BIA/Kelsey Local Television Station Revenue Forecast, Q1/2017

BIA Kelsey

64.     Defendants also increased net income during 2016 and 2017. Tribune generated a loss of $319.9 million for fiscal year 2015, but generated net income of $14.2 million and $194.1 million for 2016 and 2017, respectively.[8] For 2015, 2016, and 2017, net income for the other defendants was as follows, respectively: $171.5 million, $245.3 million, and $576 million for Sinclair; $39.3 million, $62.2 million, and $262.0 million for Gray; and $77.7 million, $91.5 million, and $475.0 million for Nexstar.

65.     Faced with the reality that they would not be able to maintain and increase their profits through mergers and acquisitions alone and staring down increasing competition for advertising dollars from digital platforms like Facebook and Google, which remain crucial to broadcast television owners' financial success, Defendants and their co-conspirators sought to increase profits by raising television advertising prices through price-fixing.

---

[8] Tribune Media Co., Annual Report (Form 10-K) (Mar. 1, 2018).

66.     In furtherance of this conspiracy, advertising sales representatives of the Defendants and their co-conspirators shared competitively sensitive information and data that allowed the companies to fix, raise, maintain, stabilize, and/or artificially inflate pricing for television advertising. Defendants engaged in the anticompetitive conduct described herein in order to charge supracompetitive prices without the risk of losing customers.

## V.     Trade Associations and Initiatives Provided Defendants with Ample Opportunities to Conspire with Each Other

67.     Defendants and their executives participate in numerous industry associations that provide the opportunity to share competitively sensitive information and conspire to effectuate their scheme.

68.     For example, the TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry."[9] TVB is designed to bring together and encourage information sharing among employees of broadcast television companies like Defendants, especially advertising sales representatives. TVB is especially dedicated to helping broadcast television companies promote and improve their advertising sales efforts. Hearst, Nexstar, Sinclair, Tegna, and Tribune are members of TVB. Nexstar's President and CEO serves as the Chairman of TVB. TVB events and initiatives provided Defendants with the opportunity to collude and to act in furtherance of their conspiracy.

69.     On November 20, 2017, a group of broadcast television companies, including Hearst, Nexstar, Sinclair, Tegna, and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV

---

[9] TVB Local Media Marketing Solutions, *Join TVB*, https://www.tvb.org/Default.aspx?TabID=335 (last visited Aug. 28, 2018).

broadcasters and their media agency partners."[10] Defendants, among others, had been working together to launch this initiative since early 2017, which provided them additional opportunity to share competitively sensitive information related to advertising sales and pricing.

70.     Nexstar's President and CEO made a public statement regarding TIP indicating that the industry "must work together as an industry."[11] Sinclair President and CEO Chris Ripley echoed this sentiment, stating, "The TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales.[12] Similarly, Tribune's President and CEO, Larry Wert, stated that the broadcast television companies, including Defendants, were "actively working together" to promote "the continued growth of our respective businesses."[13]

71.     In other words, Defendants and their co-conspirators openly worked together to develop information systems that would provide standardized data and forms that could be used to sell television advertising to potential advertisers and, in the process, shared information with each other, which was used to engage in unlawful price-fixing.

---

[10] TVB Local Media Marketing Solutions, *TV Interface Practices (TIP) Initiative*, https://www.tvb.org/Public/AutomatedTV/TVInterfacePractices(TIP)Initiative.aspx (last visited Aug. 28, 2018).

[11] Press Release, Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions (Nov. 20, 2017, 10:00 AM EST), *available at* https://www.businesswire.com/news/home/20171120005141/en/Local-Television-Broadcasters%E2%80%99-TIP-TV-Interface-Practices.

[12] *Id.*

[13] *Id.*

72.     Defendants are also members of the National Association of Broadcasters ("NAB"), which describes itself as the "premier trade association for broadcasters."[14] NAB's Television Board of Directors includes Gray TV Chairman, President, and CEO Hilton Howell, Nexstar Chairman, President, and CEO Perry Sook, Sinclair CEO Chris Ripley, and Tribune COO Kathy Clements.[15] Tegna President and CEO David Lougee and Hearst President Jordan Wertlieb serve on NAB's Executive Committee together.[16] Representatives of Gray, Hearst, Nexstar, Sinclair, Tegna, and Tribune served together with other broadcast television companies on the NAB Television Technology Committee.[17] NAB hosts numerous meetings and other events for industry members throughout the year, which Defendants' executives attend.

73.     Gray TV, Hearst, Nexstar, Sinclair, Tegna, Tribune, and several other local television station owners are also members of the Media Rating Counsel, or MRC. MRC boasts that one of the benefits of MRC membership is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.[18]

## VI.    Potential Competitors Face Other High Barriers to Enter the Market

74.     In response to a conspiracy that increases prices for consumers, market forces would typically attract new entrants seeking to exploit the pricing gap created by that

---

[14] NAB National Association of Broadcasters, *About Us*, https://www.nab.org/about/ (last visited Aug. 28, 2018).

[15] NAB National Association of Broadcasters, *NAB Board of Directors,* https://www.nab.org/about/nabBoard.asp (last visited Aug. 28, 2018).

[16] *Id.*

[17] NAB National Association of Broadcasters, *2018 Committee List*, http://nab.org/documents/about/2017NABCommittees.pdf (last visited Aug. 28, 2018).

[18] MRC Media Rating Council, *The Benefits of MRC Membership*, http://mediaratingcouncil.org/General.htm (last visited Aug. 28, 2018).

conspiracy's supracompetitive pricing. Here, however, new broadcast television companies outside the conspiracy are less likely to enter the market due to the high barriers to entry.

75.     Companies attempting to enter into broadcasting markets typically face six critical barriers: (1) governmental policy and regulations, as described above; (2) the presence of dominant broadcasters; (3) access to content; (4) audience behavior; (5) consumer costs; and (6) capital requirements.

76.     Defendants, as the existing dominant broadcasters, have long established relationships with their viewers and with advertisers. In addition, as very large companies, Defendants have more clout to negotiate programming deals with networks or syndicators. A new entrant into the market would need to invest significant capital and time in establishing itself before it would have the opportunity to work with networks.

77.     Moreover, entry into local television markets requires access to desirable programming—including production of content and/or acquisition of programming from third parties—at reasonable prices. This content, which is critical to attract viewers first and advertisers second, constitutes a significant cost to new market players.

78.     Finally, to achieve Defendants' economies of scale and audience base, which is necessary to compete in the market, would-be competitors need a prohibitively high level of capital and employees that have rare sophisticated technical knowledge.

## VII.    The DOJ Launched a Probe into Defendants' Collusion in the Television Advertising Market

79.     The Wall Street Journal reported on July 26, 2018, that the DOJ is investigating Sinclair, Tribune, and other unnamed independent TV station owners—including Hearst, Nexstar, and Tegna, according to one report—for artificially inflating prices of television ads in

violation of federal antitrust laws by coordinating efforts when their ad sales teams communicated with each other about their performance.[19]

80.     The Wall Street Journal article stated that "[g]overnment officials stumbled across the alleged ad sales practice during their review of Sinclair's $3.9 billion proposed acquisition of Tribune."[20] Antitrust investigations often arise during the course of merger reviews; potential antitrust violations sometimes come to the DOJ's attention through document analyses performed in connection with such reviews. Here, while conducting a merger investigation pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, the DOJ issued broad "second requests" for documents and data that revealed antitrust problems separate from the reported merger.

81.     When asked about the DOJ investigation, a Sinclair representative responded, "It is our understanding that this is not specific to Sinclair but focuses on the larger broadcast industry."[21]

## THE RELEVANT MARKET

82.     Plaintiff disclaims the need to plead a relevant market for its antitrust claims because Plaintiff alleges a price-fixing conspiracy that is a *per se* violation of the Sherman Act, 15 U.S.C. §§ 1 and 3. The restraint of trade and anticompetitive conduct alleged herein directly inflated or maintained prices and restrained competition in the market for the sale of television

---

[19] Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, WALL ST. J. (July 26, 2018, 5:38 PM ET), https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979 (appeared in the July 27, 2018 print edition as "TV Station Owners Face Ad-Pricing Probe").

[20] *Id.*

[21] *Id.*

advertising in the United States, constituting a *per se* violation of the Sherman Act, 15 U.S.C. §§ 1 and 3.

83.     In the alternative, Plaintiff claims that Defendants' collusion is an unreasonable restraint of trade that resulted in substantial anticompetitive effects in the market for the sale of television advertising in the United States in violation of the Sherman Act, 15 U.S.C. §§ 1 and 3, under a "quick look" or "rule of reason" mode of analysis.

84.     The relevant product and geographic market for purposes of this complaint is the market for the sale of television advertising in the United States.

## ANTITRUST INJURY

85.     Plaintiff and members of the Class are direct purchasers of television advertising from one or more Defendants or their co-conspirators in the United States.

86.     Gray TV, Hearst, Nexstar, Sinclair, Tegna, and Tribune are horizontal competitors in the market for the sale of television advertising in the United States. Together, the media companies reach more than 80 percent of households in the United States.

87.     Defendants and their co-conspirators participated as co-conspirators and performed acts in furtherance of the conspiracy alleged herein.

88.     Defendants intended to restrain trade, and actually restrained trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, by engaging in artificial manipulation of the U.S. market for the sale of television advertising—including price-fixing—and their conduct injured competition and Plaintiff and members of the Class.

89.     Defendants and their co-conspirators shared a conscious commitment to the common scheme designed to achieve the unlawful objective of inflating, fixing, stabilizing, and/or maintaining advertising rates.

90.     Rather than competing on price as horizontal competitors typically would, Defendants colluded to artificially inflate, stabilize, fix, and/or maintain prices for television advertising, thereby increasing advertising prices relative to the but-for world in which Defendants competed on price.

91.     As alleged herein, Defendants' collusion had the following effects on the U.S. market for the sale of television advertising and proximately caused injury to Plaintiff and members of the Class in the following ways, inter alia:

(a)     Defendants' unlawful anticompetitive conduct restrained price competition in the market for the sale of television advertising in the United States;

(b)     Plaintiff and members of the Class, as purchasers of television advertising from one or more Defendants or their coconspirators in the United States, paid fixed and/or artificially inflated, maintained, or stabilized prices for television advertising that were above competitive levels; and

(c)     Plaintiff and members of the Class, as purchasers of television advertising from one or more Defendants or their coconspirators in the United States, have been deprived of the benefit of free and open competition on the basis of price in the market for the sale of television advertising.

92.     Absent Defendants' and their co-conspirators' collusion, purchases of television advertising would have been at competitive prices.

93.     As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy and acts in furtherance of their conspiracy, Plaintiff and members of the Class have suffered injury in their business and property in violation of the federal antitrust laws.

94.     The injury to Plaintiff and members of the Class is the type the antitrust laws were designed to prevent and directly flows from Defendants' unlawful anticompetitive conduct.

95.     There is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade.

96.     Defendants are jointly and severally liable for the acts of their co-conspirators.

## EFFECT ON INTERSTATE COMMERCE

97.     Each year, billions of dollars of transactions in television advertisements are entered into interstate commerce in the United States.

98.     Defendants' manipulation of the market for the sale of television advertising had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

99.     Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

100.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of television advertising, the prices of television advertising would be determined by a competitive, efficient market.

## FRAUDULENT CONCEALMENT
## AND TOLLING OF THE STATUTE OF LIMITATIONS

101.    Defendants' knowing and active concealment of the conspiracy and conduct alleged herein has tolled any applicable statute of limitations. Through no fault or lack of diligence, Defendants deceived Plaintiff and members of the Class, who had no knowledge of Defendants' collusion to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising and could not reasonably discover the collusion.

102.    The very nature of Defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by Plaintiff and members of the Class.

103.    Plaintiff and members of the Class had no facts sufficient to place them on inquiry notice of the conspiracy alleged herein until July 26, 2018, when The Wall Street Journal reported that the DOJ was investigating collusion between Defendants and their coconspirators to inflate prices in the market for the sale of television advertising.

104.    As alleged herein, Defendants' collusion to fix prices in the market for the sale of television advertising was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising, which Defendants fraudulently concealed.

105.    Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

106.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including their collusion to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising.

107.    Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

108.     For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

109.     Plaintiff brings this proposed action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and 23(b)(2), and/or (b)(3) on behalf of itself and as a class action, seeking injunctive relief and damages on behalf of the following nationwide class of those similarly situated:

> All persons, corporations, and other legal entities that purchased television advertising from one or more Defendants or their coconspirators in the United States from January 1, 2014 forward (the "Class").

110.     Excluded from the Class are Defendants and their parents, subsidiaries, and corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators, the court, court staff, Defendants' counsel, and all respective immediate family members of the excluded entities described above. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to add Sub-Classes where appropriate.

111.     The Class is so numerous that individual joinder of all potential members is impracticable. Plaintiff believes that there are at least thousands of proposed members of the Class throughout the United States.

112.     Common questions of law and fact exist as to all members of the Class and predominate over any issues solely affecting individual members of the Class. The common and predominating questions of law and fact include, but are not limited to:

(a) Whether Defendants' conduct is a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

(b)  Whether Defendants unreasonably restrained trade in violation of Sections 1 and

3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

(c)  Whether Defendants engaged in a price-fixing conspiracy among horizontal

competitors in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

(d)  Whether Defendants engaged in a combination, conspiracy, and/or agreement to

stifle competition in the market for the sale of television advertising in the United

States;

(e)  Whether Defendants engaged in a combination, conspiracy, and/or agreement to

raise, fix, maintain, stabilize, and/or inflate prices in the market for the sale of

television advertising in the United States;

(f)  The identity of the participants in the conspiracy;

(g)  The duration of the conspiracy;

(h)  The nature and character of the acts performed by Defendants and their

coconspirators in furtherance of the conspiracy;

(i)  Whether the conduct of the Defendants, as alleged herein, caused injury to the

business or property of Plaintiff and members of the Class;

(j)  Whether the conduct of the Defendants, as alleged herein, reduced price

competition in the market for the sale of television advertising in the United States

and caused television advertising to be sold at artificially inflated prices;

(k)  Whether actual damages, costs, disgorgement, and/or treble damages should be

awarded;

(l)  Whether equitable relief should be awarded; and

(m) Whether Plaintiff and other members of the Class are entitled to injunctive relief and, if so, the nature and extent of such relief.

113.     Plaintiff's claims are typical of the claims of other members of the Class because Plaintiff and all members of the Class share the same injury. As alleged herein, Plaintiff and members of the Class sustained damages arising out of the same illegal actions and conduct by Defendants.

114.     Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or in conflict with the interests of the other members of the Class.

115.     Plaintiff's interests are co-extensive with and are not antagonistic to those of absent Class members. Plaintiff will undertake to represent and protect the interests of absent Class members and will vigorously prosecute this action.

116.     Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent Class members.

117.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

118.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

119.     The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

120.     The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical. The Class has a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

## CLAIMS FOR RELIEF

### Count I
### Violations of Sections 1 and 3 of the Sherman Act
### 15 U.S.C. §§ 1 and 3
### (Alleged Against All Defendants)

121.     Plaintiff incorporates by reference and re-alleges each preceding paragraph as though fully set forth herein.

122.     As alleged herein, Defendants combined, conspired, and agreed to stifle competition in the market for the sale of television advertising in the United States. Specifically, Defendants and their co-conspirators colluded to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising.

123.     Defendants' and their co-conspirators' price-fixing conspiracy alleged herein is a *per se* violation of the Sherman Act, 15 U.S.C. §§ 1 and 3. The restraint of trade and anticompetitive conduct alleged herein directly inflated or maintained prices and restrained competition in the market for the sale of television advertising in the United States, constituting a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

124.     Defendants' combination, conspiracy, and/or agreement unreasonably restrained trade in violation of the federal antitrust laws.

125.    Alternatively, the anticompetitive combination, conspiracy, and/or agreement alleged herein resulted in substantial anticompetitive effects in the market for wireless communication services in the United States in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

126.    Defendants intended to restrain trade and actually restrained trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. Defendants shared a conscious commitment to the common scheme designed to achieve the unlawful objective of fixing, maintaining, stabilizing, and/or artificially inflating television advertising prices and stifling competition in the market for the sale of television advertising.

127.    The anticompetitive combination, conspiracy, and/or agreement alleged herein unreasonably restrained trade, and there is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade. Any alleged procompetitive benefit or business justification is pretextual and/or could have been achieved through less restrictive means.

128.    The anticompetitive combination, conspiracy, and/or agreement alleged herein occurred within the flow of and substantially affected interstate commerce.

129.    As a direct and proximate result of Defendants' anticompetitive scheme and concrete acts in furtherance of that scheme, Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

130.    Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

131.     Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff and Class members are entitled to treble damages, costs, and attorneys' fees for the violations of the Sherman Act alleged herein.

**Count II**
**Injunctive Relief under Section 16 of the Clayton Act**
**for Violations of Sections 1 and 3 of the Sherman Act**
**15 U.S.C. §§ 1, 3, and 26**
**(Alleged Against All Defendants)**

132.     Plaintiff incorporates by reference and re-alleges each preceding paragraph as though fully set forth herein.

133.     Plaintiff asserts this count on behalf of itself and the members of the nationwide Class.

134.     As alleged herein, Defendants and their co-conspirators combined, conspired, and agreed to stifle competition and fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising in the United States. This combination, conspiracy, and/or agreement unreasonably restrained trade in violation of the federal antitrust laws.

135.     Specifically, the anticompetitive combination, conspiracy, and/or agreement alleged herein is a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. Alternatively, the anticompetitive combination, conspiracy, and/or agreement alleged herein resulted in substantial anticompetitive effects in the market for the sale of television advertising in the United States in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

136.     Defendants intended to restrain trade and actually restrained trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. Defendants shared a conscious commitment to the common scheme designed to achieve the unlawful objective of fixing,

maintaining, stabilizing and/or artificially inflating television advertising prices and stifling competition in the market for the sale of television advertising.

137.    The anticompetitive combination, conspiracy, and/or agreement alleged herein unreasonably restrained trade, and there is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade. Any alleged procompetitive benefit or business justification is pretextual and/or could have been achieved through less restrictive means.

138.    The anticompetitive combination, conspiracy, and/or agreement alleged herein occurred within the flow of and substantially affected interstate commerce.

139.    As a direct and proximate result of Defendants' anticompetitive scheme and concrete acts in furtherance of that scheme, Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by reason of Defendants' violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, and are entitled to injunctive relief, costs, and attorneys' fees pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

140.    Unless enjoined, Defendants' anticompetitive combination, conspiracy, and/or agreement will continue.

141.    Plaintiff's and the Class members' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

142.    Plaintiff and members of the Class seek an injunction against Defendants, preventing and restraining the Sherman Act violations alleged herein, costs, and attorneys' fees. *See* 15 U.S.C. § 26.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

(a)  certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

(b)  declare Defendants' conduct alleged herein violates Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

(c)  permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, agents and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect under Section 16 of the Clayton Act, 15 U.S.C. § 26;

(d)  find Defendants jointly and severally liable for the acts of their co-conspirators and for the damages incurred by Plaintiff and the Class;

(e)  award actual damages, costs, disgorgement, and/or treble damages under applicable law;

(f)  award Plaintiff and members of the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

(g) require Defendants to pay both pre- and post-judgment interest on any amounts awarded;

(h) award Plaintiff costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

(i)  direct any such further relief that the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  September __, 2018                Respectfully submitted,

**SCHOCHOR, FEDERICO & STATON, P.A.**

By:
*Jonathan Schochor*
Jonathan Schochor (Bar No:  07852)
Philip Federico (Bar No: 01216)
1211 St. Paul Street
Baltimore, Maryland 21202
Tel: (410) 234 -1000
Fax: (410) 234 – 1010
E-mail: jschochor@sfspa.com

Lesley E. Weaver*
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel. (415) 445-4003
Fax (415) 445-4004
E-mail: lweaver@bfalaw.com

Jayne Conroy*
SIMMONS HANLY CONROY
112 Madison Avenue
New York, NY 10016
(212) 784-6402
(212) 213-5949 fax
E-mail: jconroy@simmonsfirm.com

James M. Terrell*
METHVIN TERRELL, P.C.
2201 Arlington Avenue South
Birmingham, AL 35205
(205) 939-0199
(205) 939-0399 fax
E-mail: jterrell@mmlaw.net


*Counsel for Plaintiff*


*Counsel to move for admission *pro hac vice* as required.